# APPENDIX A - DANIEL P. KAPLAN

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| **In re:** | : | |
| | : | |
| | : | |
| | : | **Case No. 05-39258 GJK.** |
| **MESABA AVIATION, INC.,** | : | |
| | : | **Chapter 11** |
| | : | |
| **Debtor.** | : | |
| | : | |

## DECLARATION AND EXPERT REPORT OF DANIEL P. KAPLAN

# TABLE OF CONTENTS

I. QUALIFICATIONS AND ASSIGNMENT ............................................................. 1

II. OVERVIEW AND SUMMARY OF OPINIONS ................................................. 4
*Permanent Changes in the U.S. Commercial Airline Industry Are Forcing Legacy Carriers to Dramatically Reduce Their Costs, Including the Rates They Pay Regional Carriers For Providing Service* ............................................................................... 5
*Obtaining Contractual Relief is Necessary For Mesaba To Restore Its Long Term Competitive Viability* ............................................................................................. 8

III. BACKGROUND ON THE REGIONAL AIRLINE INDUSTRY ......................... 11
*The Role of Regional Carriers In Today's Hub-and-Spoke Networks* ................... 13
*Regional Jets* .......................................................................................................... 14
*Contracting Between Regional and Mainline Carriers* .......................................... 17

IV. MESABA AIRLINES ...................................................................................... 22
*Mesaba's Service Agreements with Northwest* ..................................................... 23
*Mesaba's Competitive Position In the Regional Airline Industry* ......................... 26

V. FUNDAMENTAL CHANGES IN THE AIRLINE INDUSTRY HAVE FORCED LEGACY NETWORK CARRIERS TO REDUCE COSTS .......................................... 30
*Legacy Carriers' Actions are Profoundly Affecting Regional Carriers* ................. 32

VI. THE IMPACT OF NORTHWEST'S BANKRUPTCY ON MESABA .............. 35
*The Effect of the Contraction on the Cost of Operating the Saabs* ....................... 38
*The Effect of the Contraction on Obtaining Additional Flying* ............................. 41

VII. IN ORDER TO SURVIVE, MESABA MUST REDUCE ITS LABOR COSTS   43
*Securing the Saab Fleet* ......................................................................................... 43
*Calculating the Necessary Reduction in Wage Rates* ........................................... 45
*Establishing Pay Scales to Enable Future Growth* ............................................... 49
*Competing for New Flying Without New Hires* ..................................................... 50
*Common Rating Pilot Wage Scales* ...................................................................... 55

VIII. OTHER PROVISIONS OF PILOT CBA HAMPER MESABA'S EFFICIENT OPERATION .......................................................................................................... 60
*Provisions Increasing the Cost of Merging* ........................................................... 61
*Limitations on MAIR that Effect Mesaba* ............................................................. 62
*Limitations on Sale of Assets* ................................................................................ 63

IX. CONCLUSION .............................................................................................. 63
APPENDIX A: CURRICULUM VITAE OF DANIEL P. KAPLAN ................................. i

## INDEX OF EXHIBITS

EXHIBIT 1: RJS AS A PERCENTAGE OF REGIONAL CARRIER FLEETS FOR THE LARGEST REGIONAL CARRIERS, 1998-2005 ............................................................. 15

EXHIBIT 2: DOMESTIC ENPLANEMENTS AND PROPORTION OF NETWORK CARRIER ENPLANEMENTS CARRIED BY REGIONAL CARRIERS ............................................. 17

EXHIBIT 3: OPERATING MARGINS FOR REGIONAL AIRLINES HAVE EXCEEDED THOSE OF THE LEGACY CARRIERS ....................................................................... 21

EXHIBIT 4: MESABA FLEET HISTORY ............................................................. 24

EXHIBIT 5: PINNACLE VS. MESABA ASMS (MILLIONS), 2000-2005 ............................. 27

EXHIBIT 6: CAPACITY AND OPERATING MARGINS OF SELECT REGIONAL CARRIERS . 28

EXHIBIT 7: MESABA OPERATING MARGIN, 2001-2004 ..................................... 30

EXHIBIT 8: AVERAGE SALARY PER EMPLOYEE: LEGACY VS. REGIONAL CARRIERS, 2001-2005 ............................................................................................ 34

EXHIBIT 9: MESABA HEADCOUNT COMPARISON, OCTOBER 2005 VERSUS STEADY STATE................................................................................................. 37

EXHIBIT 10: DOWNSIZING INCREASES MESABA FLIGHT ATTENDANT WAGES ............. 39

EXHIBIT 11: AVERAGE MESABA CREW COST OF SAAB PILOTS ................................... 40

EXHIBIT 12: MESABA TURBOPROP DEPARTURES FROM MSP AND DTW, 2000 VS. 2005 ................................................................................................... 42

EXHIBIT 13: MESABA SAAB PILOT AVERAGE HOURLY CREW COST AT CURRENT AND PROPOSED RATES .............................................................................. 47

EXHIBIT 14: MESABA AVERAGE HOURLY FLIGHT ATTENDANT COST UNDER CURRENT AND PROPOSED PAY SCALES ................................................................. 48

EXHIBIT 15: COMPARING PILOT COST PER HOUR OF ADDING 25 RJS ........................ 53

I, Daniel P. Kaplan, declare as follows:

# I. QUALIFICATIONS AND ASSIGNMENT

1.  I am a Director of LECG, LLC (formerly, The Law & Economics Consulting Group). LECG provides expert analysis and management consulting in economics, accounting, and finance. My business address is 1725 Eye Street, N.W., Suite 800, Washington, D.C. I have over 25 years of experience at LECG, Glassman-Oliver Economic Consultants, Inc., the U.S. Congressional Budget Office and the U.S. Civil Aeronautics Board ("CAB") dealing with issues involving competition, antitrust, economics and finance in the airline (and other) industries.

2.  I have consulted on a variety of aviation projects for both U.S. and non-U.S. clients on matters relating to international alliances, mergers, carrier selection in limited entry markets and competitive practices. At the CAB, I directed and prepared comprehensive analyses of the economic performance of the deregulated airline industry, including a Congressionally-mandated study on the impact of deregulation. I also made recommendations to the Board on a variety of regulatory issues, including mergers and airline subsidies and managed a team of economists, accountants and financial analysts. On behalf of the U.S. government, I participated in bilateral as well as multi-lateral international aviation agreements. I have also testified as an expert on airline and

1

aviation industry matters before courts and federal administrative agencies, as well as legislative bodies and antitrust authorities both in the United States and abroad.

3.     I have authored a number of articles and reports on the airline industry as well as a book (with two co-authors) published by the MIT Press. I received a Ph.D. in economics in 1974 from the University of Michigan where I specialized in industrial organization. I did my undergraduate work at the Wharton School of the University of Pennsylvania. I have taught at both American University and George Washington University. A copy of my curriculum vitae is provided as Appendix A. My professional fees for this matter are $400 per hour.

4.     I have been retained by Mesaba Aviation, Inc. ("Mesaba" or "the Company") in this matter and asked to evaluate—based on my knowledge, experience and understanding of the airline industry, airline economics, and competition—Mesaba's current and prospective competitive position in the airline industry generally, and the regional airline industry in particular. I submit this declaration in support of Mesaba's *Application to Reject Collective Bargaining Agreements Pursuant to Section 11 U.S.C. § 1113(c)*. This declaration is a statement of my opinions as well as the bases for those opinions, as supported by the work that I have performed

or supervised to date.  In forming the opinions set forth in this Declaration, I also considered and relied upon my:  (i) experience, (ii) familiarity with, and historical work in, the airline industry, (iii) review of company documents, (iv) discussions with Mesaba employees and representatives, (v) review of relevant articles, analyst reports, and publicly available information sources, (vi) review of publicly available data reported by U.S. certified air carriers to the U.S. Department of Transportation ("DOT") and the Securities and Exchange Commission ("SEC"), and (vii) review of materials submitted in connection with Mesaba's Chapter 11 case.  My consideration of the issues involved in this matter is ongoing. Accordingly, my opinions are subject to revision based on the work I may complete in the future and further documents, testimony, and other materials I may review.  If I were called upon to testify, I would testify competently to the matters set forth below.

## II.    OVERVIEW AND SUMMARY OF OPINIONS

5.    Mesaba is a regional airline that provides turboprop and regional jet services on behalf on Northwest Airlines, Inc. ("Northwest") on flights Northwest cannot serve as economically with its larger mainline aircraft.[1] Regional carriers have been a vibrant sector of the airline industry in recent years, as an unfavorable economic climate has forced the network carriers[2], like Northwest, to contract and aggressively seek ways to reduce their costs, including the costs of acquiring regional air services.

6.    Rapid growth in the use of two-engine regional jets ("RJ") has been an important impetus to the growth of regional airlines.  But, under the terms of its contract with Northwest, Mesaba's fleet is limited almost entirely to turboprops and inefficient four-engine RJs, and therefore, Mesaba has not shared in the growth experienced by other regional airlines.

7.    The bankruptcy of Northwest puts Mesaba in an extremely difficult position.    As a bankrupt firm, Northwest can terminate its existing agreements, and as a result Northwest has announced its intention to cut the size of Mesaba's turboprop operations and to eliminate entirely the

---

[1] "Mainline" aircraft refer to the relatively larger jet aircraft operated by the large network and low cost carriers such as those manufactured by Boeing and Airbus.

[2] Throughout this declaration, I will use the term "legacy" or "network" carriers to refer to American, Continental, Delta, Northwest, United and US Airways.

4

four-engine RJs.  Mesaba believes it will be unable to retain any of its current operations, let alone add to them, without establishing rates below those it had been charging Northwest for providing regional service. Mesaba, however, was not very profitable at these existing rates, and Northwest's bankruptcy is increasing Mesaba's costs.  For example, employee seniority influences wage rates, and by forcing it to contract, the seniority of Mesaba's work force—which is already high—will increase.[3]

8.      In order to compete successfully in the new economic environment, Mesaba will need substantially lower costs, which, among other things, will require it to lower the cost of its existing collective bargaining agreements ("CBAs").

**_Permanent Changes in the U.S. Commercial Airline Industry Are Forcing Legacy Carriers to Dramatically Reduce Their Costs, Including the Rates They Pay Regional Carriers For Providing Service_**

9.      In the deregulated environment, the legacy carriers like Northwest have developed networks to provide service throughout the country and around the world.  These network carriers rely on regional carriers, like Mesaba, which operate smaller equipment to serve smaller communities and to provide supplemental service on more heavily traveled markets.  As an Airlink carrier, Mesaba leases most of its aircraft from Northwest and

---

[3] Throughout this report, I use the terms "seniority" and "longevity" interchangeably.

operates them under Northwest's marketing code subject to an Air Services Agreement (the "Omnibus ASA") between Mesaba and Northwest.[4]    Under the ASA, Mesaba provides service to and from Northwest's three domestic hubs (Minneapolis, Detroit and Memphis), but Northwest is responsible for the scheduling, sales and marketing of the flights.

10.    Since 2000, the legacy carriers in the United States have been adversely impacted by a combination of weakened demand (especially among high-yield business travelers), a proliferation of low cost carriers, dramatically increased price transparency resulting from the Internet, and a sustained surge in the price of jet fuel.  Four of the country's six legacy carriers—United, Delta, Northwest and US Airways[5]—have declared bankruptcy, and the other two (American and Continental) have taken steps to avoid bankruptcy filings.[6]    In the face of these economic and financial difficulties, the legacy carriers are cutting costs and reshaping their networks.    They have cut services, retired scores of aircraft and renegotiated agreements with labor unions and regional carriers.

---

[4] "Airline Services Agreement by and between Mesaba Aviation, Inc. and Northwest Airlines, Inc.," August 29, 2005.

[5] US Airways filed for bankruptcy twice.

[6] Many of Continental's costs were already below those of the other legacy carriers as a result of its bankruptcy filings in 1983 and 1990.

11.  Network carriers largely procure regional services through "fee-for-departure" agreements, which have mostly insulated regional carriers from unexpected fluctuations in both passenger demand and fuel prices.[7]  As a group, therefore, regional carriers have remained profitable since 2001 despite the network carriers' losses of over $40 billion.  Moreover, the regional carriers have been growing while the network carriers have been shrinking.

12.  This divergence in profitability is unlikely to continue.[8]  Network carriers have been taking steps to reduce the cost of obtaining regional services, and bankruptcy has aided them.  For example, both United and US Airways—through the Chapter 11 bankruptcy process—have been able to secure better terms for their regional services by entering into new agreements or by renegotiating contracts with existing partners.  Northwest, which is in bankruptcy, recently issued an RFP seeking proposals to replace its existing operators for its entire fleet of 126 CRJs

---

[7] Under a fee-for-departure agreement, the network carrier pays the regional carrier for providing air service, and the payment is not affected by the revenues generated by the flight.  In addition, under a fee-for-departure arrangement, the network carrier typically reimburses the regional carrier for its fuel costs.

[8] As one industry analyst put it, "if you as a legacy carrier are losing billions of dollars and your partner is making hundreds of millions of dollars obviously there's a disconnect that needs to be addressed."  See "Continental to cut 69 planes from ExpressJet," *Reuters,* December 28, 2005.

(including two operated by Mesaba). [9]  Network carriers out of bankruptcy have also taken steps to reduce the cost of their regional services. [10]

### *Obtaining Contractual Relief is Necessary For Mesaba To Restore Its Long Term Competitive Viability*

13.     Mesaba now faces a financial and economic crisis. On September 14, 2005, Northwest declared bankruptcy and as a consequence defaulted on $38 million it owed Mesaba for regional services it had performed prior to its bankruptcy.  Northwest has also informed the Company that it intends to reduce by about half the number of aircraft Mesaba had been operating and not to deliver 13 additional aircraft Mesaba was to receive under its existing ASA with Northwest. [11]  Based on Northwest's actions, Mesaba anticipates its workforce will fall from 3,800 to 2,200 if it remains the operator of Northwest's fleet of 49 Saab-340s, which are 34-seat turboprop aircraft.

---

[9] Northwest Request for Proposals, December 9, 2005.

[10] Most recently, Continental announced its plans to cut by more than 25 percent the number of aircraft operated for it by ExpressJet and has solicited bids from other regional carriers.  See "Continental to cut 69 planes from ExpressJet", *Reuters,* December 28, 2005.

[11] Northwest has also informed Mesaba that, although it expects to continue operating 49 of the 100 aircraft Mesaba had been operating for Northwest, it did not expect to adhere to the terms of the existing ASA.  See *Declaration of Hien Ciao*, In re:  Mesaba, Aviation Inc., Debtor, United States Bankruptcy Court, District of Minnesota, Case No. 05-39258 GJK, February 2, 2006.

14.    While other regional carriers have been able to keep their unit labor costs low by growing (and thus adding employees at the bottom of their pay scales), Mesaba's stagnant growth has produced a more senior workforce (i.e., it has a higher proportion of employees at the top-end of its longevity steps in its pay scales) than many of its competitors.  As Mesaba is forced to contract its operations further as a result of Northwest's bankruptcy, the seniority of its remaining workforce will increase since it will furlough its most junior employees first.   Under its current labor agreement, the contraction will increase the average hourly wage of its turboprop pilots by 16.3 percent.

15.    The contraction of its operations also affects Mesaba's competitive position in securing additional flying from network carriers.  A carrier that has been growing will hire new workers to take advantage of additional flying opportunities.   In contrast, Mesaba will staff new flying opportunities with furloughed employees, putting it at a competitive disadvantage relative to carriers that have been growing.  For example, at its existing pay scales and post-contraction seniority, Mesaba would have hourly pilots costs 18.5 percent higher than Pinnacle's in adding twenty-five 50-seat RJs.  (Pinnacle is Northwest's other Airlink carrier, and it flies the bulk of Northwest's RJs).

16.     In order to remain a viable carrier, Mesaba must reduce its costs.  Mesaba believes it can maintain the scaled-down turboprop operations by offering Northwest a reduced rate, but it cannot be profitable at that rate without lower costs. Because Mesaba does not believe it can reduce its non-labor costs by a sufficient amount, it must lower its labor costs.  For example, Mesaba proposes to reduce the hourly pay scale of its Saab pilots by 15.1 percent.  Despite this lower pay scale Mesaba's average hourly cost of pilots to operate the Saabs will actually decrease by only 1.3 percent because of the increase in seniority.  Mesaba's proposed reductions will make it cost competitive with other regional carriers despite its more senior work force.  Without reduced labor costs, Mesaba would be unable to compete successfully in the markets for regional airline services.

17.     The remainder of this Declaration is organized as follows.  Section III and IV provide some background information on the regional airline industry, generally, and Mesaba, particularly.   Section V briefly discusses the changes in the network carriers and the effect of those changes on the regional carriers.   Section VI explores the impact of Northwest's bankruptcy on Mesaba, and Section VII explains why the CBA changes are necessary.  Section VIII discusses why certain provisions of its current CBA could hamper the efficient operation of Mesaba and its ability to attract the necessary capital to successfully reorganize by imposing costs

10

on mergers and other asset transfers.  Section IX offers some concluding

observations.

## III.   BACKGROUND ON THE REGIONAL AIRLINE INDUSTRY

18.     The Airline Deregulation Act, enacted in 1978, phased out the federal

government's regulation of the routes carriers could fly and the prices they

could charge.  Even prior to deregulation, however, the CAB exempted

airlines operating fleets of small aircraft from its regulations.[12]  These

regional (or "commuter") carriers used aircraft powered by propellers and

were, in many cases, un-pressurized.  They generally marketed services

under their own brands and designed their route networks and generated

revenues both from local passengers—i.e., those flying between airports

on the regional carrier[13]—and from passengers transferring to another

carrier en route to their ultimate destinations.[14]

19.     Because they operated outside the labyrinth of the CAB's regulation, the

regional carriers were relatively efficient.  (Federal government regulation

---

[12] Prior to the passage of the Airline Deregulation Act, carriers operating aircraft with 30 or fewer
seats were exempt from regulation even if they were providing interstate air transportation.  After
the passage of the act, the threshold was raised to 60 seats.  See E. Bailey, D. Graham, D. Kaplan,
*Deregulating the Airlines* (Cambridge, Mass.: MIT Press, 1985) pp. 114-16.

[13] A small number of regional carrier passengers transferred to another flight of the same carrier.

[14] For these connecting passengers, the regional carrier received a share of the passenger's total
ticket price (known as the "through fare") based on a formula originally approved by the CAB to
govern interline transportation.

served as an incubator for high costs among the larger carriers.[15]) Low costs were critical to a regional carrier's success. Not only did they serve predominately short haul routes with only limited revenue potential, they were also not shielded by government-imposed entry restrictions. The incentives to maintain low costs have remained in the deregulated environment, and the successful regional carriers since deregulation (e.g., Mesa, Republic) have—like the low cost carriers operating larger jet aircraft (e.g., Southwest, JetBlue)—also stress low cost operations.

20.     As they expanded their hub-and-spoke networks, larger carriers incorporated regional services into their service offerings, and the regional carriers' role has mushroomed with the introduction of RJs. As a result of their financial problems and the increased importance of regional airlines to their own economic success, network carriers have increasingly sought to limit their costs of acquiring regional air services by, among other measures, seeking competitive bids from multiple regional carriers. Hence, Mesaba and other regional carriers are facing increased competition for their services.

---

[15] Regulation prevented carriers from passing on the productivity gains from the substantial technological advances in the form of lower fares. As a result, labor was in a position to capture these gains in the form of higher wage rates and restricted work rules. See E. Bailey *et.al.*, *op.cit.*, pp. 95-102.

### *The Role of Regional Carriers In Today's Hub-and-Spoke Networks*

21.    While the CAB had emphasized linear (i.e., point-to-point) route structures, the legacy carriers found it efficient to reconfigure their networks under deregulation so that flights from a wide variety of destinations converge more or less simultaneously at a hub to permit the interchange of passengers and baggage.  Given the choice, passengers exhibit a strong preference for the "online" service that such hubs provide.

22.    The service enhancements hubs provide are especially attractive for small communities, who usually have non-stop service on a very limited number of routes.  Hubs allow small communities to access one-stop air service to a broad array of domestic and international destinations.

23.    Regional carriers, therefore, increasingly scheduled flights to hubs so passengers could take advantage of these wide range of services. Eventually, regional carriers largely stopped marketing under their own brand names and instead reached agreements to fly under the brands of the network carriers.[16] Network carriers have found regional carriers to be an efficient way of serving these small communities and have made them an integral part of their operations.

---

[16] There was a precedent for this under regulation.  The CAB permitted the "Allegheny Commuters" to replace Allegheny's mainline service while the industry was still regulated.

13

### Regional Jets

24.     Regional carriers originally operated only relatively small propeller-driven aircraft.  More recently, however, many regional carriers have transitioned part or all of their fleets to regional jet aircraft, which tend to be larger and more attractive to passengers than turboprops.[17]

25.     U.S. regional carriers began widely adopting RJs in the 1990s with the advent of the Canadair CRJ.[18]  These first of the "new first generation" RJs were not much larger than many of the turboprop aircraft in service, but passengers exhibited a strong preference for these aircraft since they were faster, quieter and could fly at higher altitudes.  Though RJs are generally more expensive to operate than comparably sized turboprops over a given stage length, the increased revenue generated by the higher passenger demand more than compensated for the higher cost to the legacy carrier.   The success of the RJs has led the manufacturers (Bombardier and Embraer) to introduce larger regional jet aircraft, further fueling demand.  Larger regional jets, with lower unit costs (for example, cost per available seat mile) have begun to enter service, and

---

[17] At the time the Airline Deregulation Act was enacted, none of the trunk carriers, the largest carriers, operated turboprop equipment, but some local service carriers did.

[18] These were not the first jet aircraft smaller than those traditionally operated by mainline carriers. Most notably, British Aerospace produced the Bae-146 in the 1980s and an updated version labeled the Avro in the 1990s.  Mesaba is currently the only Avro operator in the United States.

14

consequently, regional jets are being deployed across a wider range of routes.[19] As of 2005, 87 percent of regional carrier fleets were RJs.

**EXHIBIT 1: RJS AS A PERCENTAGE OF REGIONAL CARRIER FLEETS FOR THE LARGEST REGIONAL CARRIERS, 1998-2005**



Sources: 2000 through 2004 from Annual Reports of the Regional Airline Association; 2005 from U.S. DOT Form 41: FAA website: AMR Corp 10Q filing for 2005 Q3
Notes: Regional carriers include Air Wisconsin, Allegheny, American Eagle, Atlantic Coast, Atlantic Southeast, Chautauqua, Comair, Continental Express/ExpressJet , Horizon, Mesa, Mesaba , Piedmont, Pinnacle/Express Airlines 1, SkyWest, and Trans States. Atlantic Coast and Allegheny are not in 2004 and 2005. 2005 figures are from Form 41 2005 Q3, except 2005 Chautauqua from FAA website and 2005 American Eagle from AMR 10Q.

26.    The network carriers' contracts with their pilots contain "scope clauses" that limit their ability to contract with regional carriers to operate aircraft on behalf of the network carriers. These scope clauses specify the number and the sizes of aircraft a network carrier can deploy that do not use mainline pilots. In the difficult economic conditions facing carriers in the post-September 11 environment, pilots' unions of the network carriers agreed to relax the scope clauses in their respective contracts.[20]

---

[19] In making scheduling decisions, carriers do not explicitly consider seat mile costs. Rather, they seek to develop profit-maximizing schedules, so that no switch of aircraft in a carrier's schedule would increase its overall profit. The use of a larger aircraft on a route, for example, would only be profitable if the added passengers generated enough revenue to cover the increase in cost the carrier incurred from operating the larger plane.

[20] See Regional Airline Association, *2005 Annual Report,* p. 28.

27.     As Exhibit 2 demonstrates, by 2004 the regional carriers had accounted for 28.8 percent of enplaned passengers on the legacy carriers' networks.  The regional carriers' share has grown especially rapidly since September 11, as they have expanded and the mainline operations of the network carriers have contracted.  While the use of RJs has grown dramatically, they have not completely supplanted turboprop operations.  Over short stage lengths, turboprop aircraft are typically much less costly to operate and do not require significantly more time to travel between origin and destination than an RJ.  Consequently, turboprops have and will continue to have a definable niche in the legacy carriers' networks.  This niche, however, is largely limited to routes of 400 miles or less connecting small communities to the hubs of major carriers. Furthermore, more rigorous and time-consuming security screening (i.e., the "hassle factor") has also made flying on short-haul routes less convenient than before, and consequently, the number of passengers traveling less than 400 miles has declined sharply since September 11th.

**EXHIBIT 2: DOMESTIC ENPLANEMENTS AND PROPORTION OF NETWORK CARRIER ENPLANEMENTS CARRIED BY REGIONAL CARRIERS**



Source: US DOT Form 41 Database; RAA 2004 Annual Report; RAA 2001 Annual Report; RAA website.
Notes: Network Total is the sum of the Network Carriers plus the large Regional Carriers. Figures for all carriers except regional carriers are from Form 41. Network Carriers include mainline operations of: American, Continental, Delta, Northwest, United and US Airways .

### *Contracting Between Regional and Mainline Carriers*

28.     As regional carriers' role in the legacy carrier networks has increased, the economic relationships between the regional and network carriers have changed. At first, regional carriers operated independently of the network carriers, even in the cases where they had a codeshare relationship.[21] That is, regional carriers earned revenues from the fares paid by local passengers plus a portion of fares paid by connecting passengers.[22]

---

[21] "Codesharing" is a common airline industry practice whereby one carrier places its two-letter designator code on flights operated by another carrier.

[22] For example, the commuter carrier would keep the fares of passengers who flew on its Erie-Pittsburgh flight, but split the through fares of those passengers connecting onto mainline flights to Detroit or Cincinnati.

17

29.     Ultimately each network carrier determined that it was more efficient for it

to incorporate more fully these regional carriers into its schedule.  Such

control can be realized through two different approaches.  Under one

approach, the network carrier owns and operates one or more regional

carriers.    (American Airlines, for example, acquired Simmons and

Business Express and operates them as part of a wholly owned subsidiary

labeled American Eagle.[23])  With a single entity owning both the network

carrier and the regional carriers, it can maximize their joint profits and end

the tendency of one carrier to take commercial actions not advantageous to

the other.[24]

30.     But an alternative approach may prove to be even more cost effective for

the legacy carrier.[25]  Under this approach, a network carrier contracts with

one or more independent regional carriers to operate aircraft, while the

network carrier retains control of scheduling and pricing.[26]  Like the case

---

[23] Similarly, Delta acquired Comair and Atlantic Southeast Airlines, and Northwest acquired Express Airlines I (now Pinnacle Airlines).

[24] A number of network carriers who had previously acquired or created regional carriers have recently divested them, either by selling their assets to another regional carrier (e.g., the sale of Atlantic Southeast by Delta to SkyWest) or by initial public offering (e.g., Pinnacle and Continental Express).  In addition to providing a much-needed infusion of cash, such divestitures can provide added benefits to both carriers.  The network carrier gains increased flexibility in contracting for regional flying, and the regional carrier can gain new opportunities.

[25] By contracting for service rather than owning the carrier outright, a network carrier can exert greater control and provide some protection against opportunistic behavior.  Fee for departure arrangements, however, often have performance incentives.

[26] In the industry, the relationship is often referred to as "fee per departure," although the payment schemes are far more complex.

of a network carrier acquiring a regional, contracting for capacity assures the divergent incentives of the regional and network carrier do not interfere with the underlying profitability or performance of the network carrier's hub.  Moreover, the process of soliciting competing bids from a number of regional carriers is likely to reduce the overall cost of the service to the network carrier.[27]   Contracting with independent regional carriers to provide service allows the network carrier to establish the contract terms in a competitive market.[28]   Even carriers that own a regional carrier also contract with independent regionals.   Indeed, Northwest recently issued an RFP for the right to operate its existing fleet of two-engine RJs.[29] Historically, it had relied exclusively on Mesaba and Pinnacle for its regional services.[30]

31.     Increasingly, network carriers are seeking bids from numerous carriers to provide their regional services.  Likewise, most of the network carriers in bankruptcy have rejected their regional carrier agreements and used

---

[27] Some of these independent regionals, for example Mesa and Republic, have never been owned by a network carrier.

[28] The particular terms of fee-for service contracts vary widely.  In some cased the network carrier furnishes the aircraft, and contracts also differ with respect to the assumption of risk and guarantees of minimum flying.  The network carrier may also limit the amount of flying a regional carrier can do for others.

[29] Northwest, "Request for Proposal," December 9, 2005.

[30] Until 2003 Pinnacle was a wholly owned subsidiary of Northwest.  Since the mid-1990s, Northwest has owned approximately 28 percent of MAIR, the holding company that owns Mesaba.

competitive bidding to establish new rates.   In fact, Atlantic Coast Airlines' refusal to accept a rate reduction ultimately led United to contract with Mesa and Republic to replace Atlantic Coast.   United also ceased its longstanding partnership with Air Wisconsin.   In selecting Air Wisconsin and Republic to provide regional service for it, US Airways ended its relationship with Mesa and required the regional carriers to make investments.[31]   The result of Northwest's RFP, therefore, could very well lead to the replacement (in whole or part) of Mesaba and Pinnacle, the carriers currently providing its Airlink services.   Changing regional partners can also occur outside of bankruptcy, as illustrated by Continental Airlines' decision to withdraw aircraft from its ExpressJet subsidiary and put them out for competitive bidding.   As one Continental Vice-President noted, "We didn't want to take this action, but we were not able to reach an agreement with ExpressJet to lower our cost."[32]

32.   As discussed subsequently, the network carriers have experienced unprecedented losses over the past few years.   Regional carriers have for the most part been profitable.   This disparity in profit margins between the

---

[31] As a condition to entering into the agreements, US Airways required Republic Airlines and Air Wisconsin to provide financing at the time of US Airways' exit from bankruptcy. (Republic bought assets and leased them back to US Airways.)  Mesa, who had an agreement to provide regional service for US Airways refused to make an equity investment in the post-bankrupt carrier, and therefore, shifted the resources it had used for US Airways to provide service for United.  A mainline carrier requiring an investment in it by a regional carrier to gain a contract represents a de facto rate concession by the regional carrier.  The payments made by the mainline carrier compensate the regional carrier for providing air service but also for providing financing.

[32] Source:  "Continental to cut 69 planes from ExpressJet," *Reuters*, December 28, 2005.

regional and network carriers coupled with the expanding role of the regionals has increased the legacy carriers' motivation to find lower cost regional services.

### EXHIBIT 3: OPERATING MARGINS FOR REGIONAL AIRLINES HAVE EXCEEDED THOSE OF THE LEGACY CARRIERS



Sources:  U.S. DOT Form 41 Database; SEC Form 10-Ks, 10-Qs, and carriers' earnings releases.
Notes:  Legacy Network Carriers include Continental, Delta, Northwest, United, US Airways, and American. Regional carriers include Pinnacle, Mesaba, Skywest, Atlantic Coast, Republic, Express Jet, Mesa, Atlantic Southeast, American Eagle, Horizon, Air Wisconsin, and Comair; Comair is not in 2001 and Atlantic Coast is excluded in 2004. Operating margin is calculated as operating profit divided by operating revenue.

33.    Although the expanded reliance on RJs spurred rapid growth for most regional carriers, the primary role of a regional carrier continues to be operating as part of a larger carrier's network.  There are few instances in which regional aircraft services are not presently being offered as part of a larger carrier's network.  In short, a regional carrier has little alternative other than contracting with network carriers—as illustrated by the recent experience of Independence Air.  In that case, Atlantic Coast Airlines abandoned a successful history as a carrier providing regional services for United and Delta by establishing Independence Air with a sizable a hub at

Washington's Dulles International Airport.  Although it supplemented its fleet of 50-seat RJs with a number of larger Airbus aircraft, the effort ultimately failed.  Independence Air ceased operations on January 5, 2006, only 18 months after its launch.[33]

## IV.  MESABA AIRLINES

34.    Mesaba began operations in 1944 and presently serves as a Northwest Airlink regional partner at Northwest's Detroit, Minneapolis and Memphis hubs.  In 1995, it signed one of the industry's first fee-for-departure agreements when it contracted to operate Northwest's fleet of Saab aircraft.  At the time it entered into that agreement, Northwest acquired an ownership interest in MAIR Holdings.[34]

35.    At the time it filed for bankruptcy, Mesaba operated a fleet of 63 Saab-340 turboprops, 35 Avro-85 regional jets and 2 CRJ-200s.[35] Mesaba provides service only for Northwest and most of its aircraft are leased from Northwest.  Its operations centered on turboprops and relatively inefficient four-engine RJs.  While two-engine RJs fueled regional carrier growth,

---

[33] The other primary use of regional aircraft operating outside of a larger carrier's network is for service within the state of Alaska.

[34] Northwest owned over 25 percent of MAIR Holdings as of September 1, 2005.  See MAIR Holdings, "SEC Form 8-K," September 1, 2005.

[35] Mesaba operated each fleet of aircraft under separate agreements with Northwest, until Northwest and Mesaba executed an Omnibus agreement to govern the entire fleet in the summer of 2005.

Mesaba only began operating CRJs shortly before Northwest filed for bankruptcy. Its slower growth has in turn increased its costs relative to other carriers by, among other things, increasing the seniority of its workforce.

### Mesaba's Service Agreements with Northwest

36.    The original Northwest agreement was amended and extended, and ultimately Mesaba operated as many as 81 Saab turboprops for Northwest at all three of its hubs. Under the Saab ASA, Northwest paid Mesaba on an available seat mile ("ASM") basis with the rate adjusted annually to reflect changes in the Producer Price Index.[36] Mesaba, therefore, bore the risk of cost escalation for items such as maintenance and insurance, and it was also responsible for ground handling.[37] Under the agreement, Mesaba had exclusive rights to provide turboprop service at Northwest's hubs, but Mesaba was precluded from providing service to any other carrier.

---

[36] An ASM is a standard industry measure of capacity and represents one seat being flown one mile.

[37] The agreement also required Mesaba to meet certain obligations with respect to such issues as onboard service and operations. For example, Mesaba had to meet specific completion factor and on-time reliability goals.



**EXHIBIT 4: MESABA FLEET HISTORY**

Source: Mesaba Annual Reports: Mesaba Company Information.
Notes: Fleet count for 2004 as of March, 2004. Fleet count for 2005 as of December 2005.
*Projected year end fleet total.

37.    In 1997, Northwest purchased a fleet of four-engine regional jets from British Aerospace, and Mesaba entered into a separate aircraft ASA (the "Avro ASA") with Northwest to operate them.  Although the Avros are capable of accommodating 85 passengers in single class service, Northwest elected to operate them using a two-class configuration with 69 seats, due in part to the scope clause in its collective bargaining agreement with its pilots.    The four engines make the Avros fuel inefficient compared to newer generation RJs and the cost disadvantage of operating

24

these aircraft has increased with the recent surge in fuel prices.[38] Northwest compensated Mesaba on a rate per block hour. As with the Saab ASA, under the Avro ASA that rate was adjusted according to changes in the Producer Price Index, with Mesaba absorbing risks associated with such things as maintenance and insurance.[39]

38. In Spring of 2005, Northwest decided to diversify the operation of its fleet of 50-seat CRJ-200s. Rather than allocating the additional RJs to Pinnacle (its sole operator of CRJ aircraft at the time), Northwest requested a proposal from Mesaba and others to operate the fifteen 50-seat CRJs it planned to acquire. Mesaba reached an agreement with Northwest and received FAA approval to operate the aircraft in September 2005, when the first two aircraft were delivered.[40]

---

[38] For example, the Mesaba Avro uses 26 percent more fuel per seat per block hour than the average of the regional carriers' usage of Canadair CRJ-700s and 45 percent more than Mesa's CRJ-900s. (A "block hour" is a common industry measures that refers to the elapsed time from when an aircraft pushes back from its departure gate until it reaches its arrival gate.) Source: U.S. DOT Form 41 Database. Likewise, as noted by Northwest Senior Vice President Finance and Controller Dave Davis, the Avros "are essentially uneconomic, especially at today's fuel prices…" See *Transcript of Evidentiary Hearing, Volume 2*, Section 1113 and Section 1114 Motions Before the Honorable Allan L. Gropper, In Re: Northwest Airlines Corporation, et al, Debtors, January 18, 2006.

[39] Mesaba also had to absorb costs associated with increased security requirements.

[40] The RJ contract award was influenced by warrants that MAIR, Mesaba's holding company, agreed to issue to Northwest. The warrants were to be issued upon delivery of specified numbers of CRJs by Northwest. These rights replaced Northwest's existing warrants. See MAIR Holdings, Inc., "SEC Form 8-K," September 1, 2005.

39.     After awarding the new CRJs to Mesaba, Northwest and Mesaba
negotiated the Omnibus ASA to cover Mesaba's operation of all three
aircraft types.  While there continued to be some differences in the method
of compensation and the parties' responsibilities among the aircraft, the
agreement synchronized various performance requirements and remittance
terms.  Moreover, unlike Mesaba's previous ASAs with Northwest, the
Omnibus ASA gave Mesaba the right to fly any size aircraft for another
party so long as that service did not involve service at a Northwest hub.

### Mesaba's Competitive Position In the Regional Airline Industry

40.     Like other network carriers, Northwest has dramatically increased its
regional flying since 2000.  For example, since 2000, Northwest acquired
126 RJs, virtually all of which it placed with Pinnacle, its former
subsidiary.  As a result, Pinnacle's RJ fleet grew from 9 in 2000 to 124 by
2005.  Mesaba, Northwest's only other Airlink partner, did not share in
that growth.  Between 2001 and 2005, its available seat miles grew at an
average annual rate of less than one percent, and the number of aircraft
operated by Mesaba remained virtually constant.[41]

---

[41] Mesaba's fiscal year ends on March 31.  Because Northwest had awarded Mesaba a contract to
operate 15 RJs, Mesaba had anticipated growth in 2006.

EXHIBIT 5:  PINNACLE VS. MESABA ASMs (MILLIONS), 2000-2005

Sources:  10-K and 10-Q filings, and company press releases.
Notes: Calendar years

41.    Pinnacle was not the only regional carrier that grew rapidly.[42]  As other large network carriers expanded their RJ fleets, regional carriers such as American Eagle and Comair, which were owned by the network carriers, and independent regionals like Mesa, SkyWest and Republic also grew rapidly. Mesa, Republic, and SkyWest each provide regional service for a number of network carriers and each has flourished in the post-September 11 environment.  As demonstrated by Exhibit 6, between 2000 and 2004, Republic's ASM's grew five-fold, and Mesa's ASMs grew by 151 percent. Furthermore, Republic and SkyWest had operating margins in

_____

[42] Pinnacle had been a wholly owned subsidiary of Northwest until 2003, when Northwest contributed 88.6 percent of its stock in Pinnacle to its defined benefit pension plans in lieu of cash to reduce the funding shortfall of the plan.  Northwest had acquired Express Airlines I in April 1997 and renamed it Pinnacle in May 2002.

excess of 10 percent for 2004, while Mesa's operating margin was close to

nine percent.

### EXHIBIT 6: CAPACITY AND OPERATING MARGINS OF SELECT REGIONAL CARRIERS

| | ASMs (mil) | | Operating Margins | |
|---|---|---|---|---|
| | 2000 | 2004 | 2000 | 2004 |
| **Mesaba** | 2,953 | 2,975 | 8.6% | 2.5% |
| **Mesa** | 3,043 | 7,637 | 8.6% | 8.6% |
| **SkyWest** | 2,257 | 7,546 | 17.0% | 12.5% |
| **Republic** | 870 | 4,425 | 4.9% | 18.6% |

Source: U.S. DOT Form 41; Carriers' 10-Q and 10-K filings
Notes: Operating margin is calculated as operating profit divided by operating revenue.
Figures for Mesaba are from Form 41; figures for other carriers are from carriers' 10-Q and
10-K filings.

42.     Throughout what has been a period of strong growth for the regional

airline industry as a whole, Mesaba has been hamstrung by the fact that

Northwest—its exclusive partner—chose not to rely on it for the bulk of

its additional RJ flying. In addition, Mesaba's contract with Northwest,

until recently, precluded it from serving other network carriers.  As a

result, Mesaba's growth remained largely stagnant.  Northwest's recent

cutbacks threaten to reduce further Mesaba's presence in the industry.

43.     Growth—or a lack thereof—has profound implications on an airline's

costs for two reasons.  First, there are economies of scale in providing

airline services at least up to some scale of operation, and Mesaba operates

28

at a scale such that increased operations would reduce its unit costs.[43] Moreover, even under bankruptcy protection, Mesaba does not expect to reduce its overhead costs in proportion to the anticipated reduction in its scale of operation. Thus, Mesaba's contraction is likely to put upward pressure on its unit costs, as certain fixed costs must be spread over significantly less capacity (e. g., ASMs).

44.     Second, the growth of a carrier also affects its costs by the changing seniority of its workforce. An employee's wage rate increases with seniority and in the case of most airline employees, there is no increase in productivity to compensate for the higher wage.[44] Thus, a growing carrier will tend to have far more of its employees concentrated at more junior, lower wage levels while a carrier that has not grown (or has been contracting) will have a greater proportion of its employees at the more senior and higher longevity wage scales.[45] Even before Northwest's cutback, Mesaba's profit margin was lower than other regionals, and as Exhibit 7 demonstrates, it had been declining. Mesaba's profit margin was

---

[43] These economies result from certain discontinuities in the production process. For example, a carrier can operate an efficient training program for a given number of pilots a month, on a given type of equipment. If it trains fewer pilots its average cost will be higher.

[44] For example, operating a flight for an hour still requires an hour of pilot time regardless of the pilot's seniority.

[45] The seniority of Mesaba's pilots has also been affected by the decline in job opportunities at network carriers since September 11th. Regional pilots have historically been an important source of mainline hiring, but with a large number of network carriers furloughing workers, many fewer of such opportunities exist.

adversely affected by a variety of factors outside of its control, including

Northwest scheduling and fleet planning decisions, which directly affected

Mesaba's costs.   In addition, Mesaba was also adversely affected by

increased insurance, security and ground handling costs that were directly

attributable to 9/11.[46]

**EXHIBIT 7: MESABA OPERATING MARGIN, 2001-2004**



Sources:  U.S. DOT Form 41.
Notes: Based on calendar years. Operating margin is calculated as operating profit divided by operating revenue.

## V.  FUNDAMENTAL CHANGES IN THE AIRLINE INDUSTRY HAVE FORCED LEGACY NETWORK CARRIERS TO REDUCE COSTS

45.    Fueled by robust economic growth and strong demand—especially among

high yield business passengers—legacy network carriers were highly

profitable during the mid to late 1990s, recording net profits of

---

[46] See *Declaration of John Spanjers*, In re:  Mesaba, Aviation Inc., Debtor, United States
Bankruptcy Court, District of Minnesota, Case No. 05-39258 GJK, February 2, 2006.

approximately $17 billion between 1995 and 2000.  However, numerous structural changes in the industry have dramatically affected legacy carriers' financial position: (1) accelerating growth and geographic spread of competition from low cost carriers ("LCCs"); (2) increased price transparency and widespread access to low fares made possible by new Internet-based search engines;  (3) a shift by time-sensitive travelers away from high yield tickets; (4) a dramatic decline in passenger traffic immediately following the terrorist attacks of September 11th and the after-effects of the attacks (i.e., the "hassle factor" and higher security costs) that continue to the present day; and (5) a dramatic increase in the price of fuel over the past few years.

46.     These developments over the past five years have plunged the industry into what is undoubtedly its worst financial crisis in history. Between 2001 and 2005, the major network carriers recorded net losses of $42.3 billion—significantly more than the net profits the industry had earned between 1995 and 2000, and more than five times as large as the losses from the previous cyclical downturn (1990-1992).[47] Consequently, four legacy carriers—including United, US Airways (twice), Northwest and Delta—representing more than half of all U.S. mainline (i.e., non-

---

[47] Net income was -$7.8 billion from 1990 to 1992.  Operating profits were $32 billion from 1995 to 2000, and approximately -$34 billion from 2001 to 2005.  Source: U.S. DOT Form 41, company 10Qs and 10Ks.

regional) airline capacity—have filed for Chapter 11 bankruptcy
protection since 2000.

### *Legacy Carriers' Actions are Profoundly Affecting Regional Carriers*

47.     As a result of the more challenging revenue environment post-September
        11, legacy carriers have taken dramatic steps to reduce their costs. Legacy
        carriers have reduced capacity, rejected or renegotiated aircraft leases and
        secured—or are in the process of securing—significant wage reductions.[48]
        They have also rejected contracts with regional carriers.

48.     Likewise, as part of the new pilot CBAs negotiated in the wake of
        September 11th, each of the large network carriers has gained greater
        flexibility to deploy RJs. For example, through its bankruptcy, US
        Airways obtained the right to increase the number of RJs it operated from
        70 to 465 and to increase the maximum capacity of those aircraft from 50
        to 90 seats. Likewise, United gained the ability to operate an unlimited
        number of 70-seat RJs so long as the total number of block hours operated
        by United Express carriers does not exceed the block hours of the mainline
        carrier. Similarly, Delta's new CBA (agreed to in late 2004) increased the
        number of 70-seat RJs it can deploy with its Delta Connection partners,

---

[48] As of January 2006, the primary exception is Northwest, which is currently seeking to terminate
several of its collective bargaining agreements pursuant to §1113(c) of the U.S. Bankruptcy code.

and Delta is currently seeking agreement to deploy up to 200 79-seat RJs. Finally, Northwest is currently seeking the flexibility to deploy unlimited numbers of 76-seat RJs using its existing and future Airlink partners.

49.    A combination of larger RJs and changes to the scope clauses in network carriers' CBAs has enabled some regional carriers to assume an increasingly important role in legacy carriers' networks. As their reliance on regional services has increased, the network carriers have also been able to choose from among a number of potential regional airline partners.

50.    An important source of regional carriers' cost advantage has been lower labor costs. Employees of regional carriers are not—and have never been—compensated as generously as employees of the legacy carriers.[49] Following the reductions in labor costs at the legacy network carriers, however, the gap between regional and mainline carriers is declining. Exhibit 8 demonstrates this narrowing gap. Most notably, "restructured" legacy carriers US Airways and United have experienced a larger drop in average employee compensation than the other network carriers. The decline in relative network carriers' costs is putting added pressure on regional carriers to reduce their costs as well.

---

[49] Part of the difference relates to aircraft size: because network carriers operate larger aircraft and hence generate greater revenue, their employees are paid more.

**EXHIBIT 8: AVERAGE SALARY PER EMPLOYEE: LEGACY VS. REGIONAL CARRIERS, 2001-2005**



Sources: U.S. DOT Form 41; AirCon employment statistics
Notes: Other Legacy Carriers include: American, Continental, Delta, and Northwest. Regional Carriers include: Mesaba, Comair, Continental Express/ExpressJet, Atlantic Southeast, American Eagle, Horizon, and Air Wisconsin. 2002 salary figure for Comair is annualized based on 2002 Q4 figure; there are no 2001 data for Comair. There are no 2001 and 2002 data for ExpressJet. 2005 salary figures for Legacy Carriers are annualized based on 2005 Q2 salary figures. 2005 headcount figures for Legacy Carriers represent the simple average of 2005 Q1 and Q2 headcount figures.
* 2005 Average Salary per Employee figure for Regional Carriers is an estimate, calculated by applying the 2003 to 2004 growth rate of average salaries for Regional Carriers to 2004.

51.     As has been previously noted, the changing competitive environment is also affecting the rates legacy carriers are paying regional carriers for their services.   As in the recent case of Continental, there are examples of carriers not in bankruptcy seeking lower rates from their regional affiliates.   Not surprisingly, regional carriers that have been unable or unwilling to meet market prices have seen substantially less demand for their services.   Atlantic Coast Airlines' failed attempt at operating independently of a network carrier demonstrates the risk in pursuing a "go-it-alone" strategy, and therefore, may increase network carrier leverage in negotiating with regional carriers.

34

## VI.    THE IMPACT OF NORTHWEST'S BANKRUPTCY ON MESABA

52.    Although Northwest has increased the overall size of its Airlink fleet in recent years, the amount of flying it has allocated to Mesaba has actually contracted somewhat.   Now that Northwest is in bankruptcy and without new agreements with other network carriers, Mesaba can expect to contract at an even faster rate.   Northwest has announced its intention to return all 35 Avros and 14 of the Saabs operated by Mesaba to their lessors.[50]   Mesaba is operating only 23 Avros in January 2006, and Northwest plans to discontinue operating the aircraft entirely by December 2006.[51]   Mesaba's fleet of Saabs, presently at 52 aircraft, will fall to 49 in April.[52]   Northwest has also informed Mesaba that it will withdraw the 2 CRJs from Mesaba's fleet if it is not awarded additional CRJ flying as a result of Northwest's December 9, 2005 RFP.

53.    Even if Mesaba retains the right to operate Saab aircraft for Northwest, the latter's bankruptcy will cut in half the number of aircraft Mesaba operated in 2005.   Northwest, however, has also informed Mesaba that it expects to

---

[50] For example, when asked during cross examination at Northwest's §1113 and §1114 bankruptcy hearing "What are Northwest's plans with respect to its Avros?", Northwest's Senior Vice President of Finance and Controller responded "The plan with respect to the Avros is to get rid of them through this process".  See *Transcript of Evidentiary Hearing, Volume 2*, Section 1113 and Section 1114 Motions Before the Honorable Allan L. Gropper, In Re:  Northwest Airlines Corporation, et al, Debtors, January 18, 2006.

[51] Spreadsheet entitled "2006 Mesaba Fleet Plan" provided by Northwest to Mesaba, January 5, 2006.

[52] *Ibid.* Northwest has already returned 11 Saabs (Model B) to their lessor and has informed Mesaba of its intention not to include 3 Model A's in its April 2006 schedule.

35

pay a lower rate for operating these aircraft.[53]  Mesaba anticipates that as a result of this process Northwest will obtain a rate reduction of at least five percent on the turboprop operations.[54]

54.    Even if it were to maintain the Saab flying, Mesaba would be a substantially smaller carrier than it would have been absent Northwest's bankruptcy.  At the time of Northwest's bankruptcy, Mesaba had 3,800 employees and expected its annual revenues to be $470 million.[55] Operating a reduced fleet of 49 Saabs requires only 2,200 employees. Mesaba anticipates that a 49 Saab operation will generate only $207 million in annual revenues.  (This assumes Northwest pays Mesaba at a rate five percent below what Mesaba presently receives.)  Exhibit 9 demonstrates that the resulting furloughs will have the greatest effect on pilots and flight attendants.

---

[53] Northwest has told Mesaba it will consider a proposal to continue operating its fleet of Saabs, but it intends to issue an RFP for the Saab flying if it finds the proposal unacceptable.  Northwest offered a similar RFP on December 9, 2005 with respect to its fleet of CRJs, which are currently operated almost exclusively by Pinnacle.  Likewise, Northwest's Senior Vice President Finance and Controller Dave Davis indicated that Northwest was targeting annual savings from Mesaba and Pinnacle of sixty to eighty million dollars.  See *Transcript of Evidentiary Hearing, Draft Transcript – AM Session*, Section 1113 and Section 1114 Motions Before the Honorable Allan L. Gropper, In Re:  Northwest Airlines Corporation, et al, Debtors, January 19, 2006.

[54] See *Declaration of Hien Cao*, In re: Mesaba Aviation Inc..

[55] This is based on the annual revenues Mesaba estimates it would have generated by operating a fleet of 63 Saabs, 35 Avros, and 15 CRJs in fiscal year 2006, which ends March 31.  Mesaba would have been operating the full complement of 15 CRJs in the final month.

**EXHIBIT 9: MESABA HEADCOUNT COMPARISON, OCTOBER 2005 VERSUS STEADY STATE**



Sources: Mesaba airline.
Notes: "Steady State" represents expected final employee count with 49 Saabs. Excludes furloughed pilots.

55.    To maintain the anticipated profit margin with the smaller fleet, Mesaba would have to reduce its expenses in proportion to the reduction in revenues, i.e. by 56 percent.[56]   But, as noted earlier, Mesaba's existing infrastructure and labor contracts prevent it from reducing its costs in proportion to the decline in revenue, and Mesaba will simply be unable to reduce some of its costs in proportion to the reduction in revenue. Moreover, the price of some inputs, such as the average wage rates of some employee groups, will increase as the average seniority of its work

---

[56] This compares Mesaba's anticipated revenues in FY2006 with its anticipated steady state revenues of operating a fleet of 49 Saabs.  Mesaba projected a profit margin of only 1.2 percent, excluding $15.6 million starting expenses associated with the RJs.  See Spreadsheet "Overview of Process Which Resulted In The 19.4 percent Target Wage and Benefit Reduction," Mesaba, November 20, 2005.

force also increases and those employees move up the longevity scale of the pay charts.

### *The Effect of the Contraction on the Cost of Operating the Saabs*

56.    Consider for example, the impact of the contraction on Mesaba's cost of flight attendants.    In October 2005, Mesaba employed 578 flight attendants, and those flight attendants had an average of 5.3 years of seniority.[57]    Mesaba estimates it would need only 215 flight attendants to operate Northwest's 49 Saab flying.    If Mesaba operated those aircraft with its 215 most senior flight attendants, the average seniority of its flight attendants would increase by 37 years to 9.0 years.    This increase in seniority would translate into a 17.3 percent increase in the average hourly wage.[58]

---

[57] Mesaba had a relatively high proportion of its flight attendants at low levels of seniority because of hiring related to the 15 CRJs it had contracted to operate for Northwest.

[58] This compares, at a given period of time, the average hourly pay of the workforce before the downsizing with what the average hourly wage would be at the same time for the downsized company.  Payscales were prepared by Chris Hegland of PayCraft Consulting on behalf of Mesaba on November 3, 2005.

**EXHIBIT 10: DOWNSIZING INCREASES MESABA FLIGHT ATTENDANT WAGES**

|  | Before Downsizing | After Downsizing |
|---|---|---|
| **Number** | 578 | 215 |
| **Average Seniority*** | 5.3 | 9.0 |
| **Average Hourly Wage** | $21.25 | $24.92 |

Source: Mesaba Airlines.
Notes: Pay scales and Mesaba seniority as of October 2005. "After Downsizing"
assumes lowest seniority flight attendants are furloughed.
* Flight attendants receive a pay increase after 6 months, and again after 2 years
and each year thereafter.  For "Average Seniority" calculations we credited flight
attendants with less than six months as .5, six months to two years as 2, and
increasing by one year each year thereafter.

57.    Downsizing will affect the average wages of other employee groups at
Mesaba as well.  Of the unionized employees, only the pilots account for
more employees than the flight attendants.[59]  Unlike flight attendants,
seniority is not the sole determinant of a pilot's wage rate; it also depends
on the seat occupied (captain or first officer) and the type of equipment
operated.[60]  At Mesaba, for example, a top-of-scale Avro captain makes
47.5 percent more per hour than a top-of-scale Saab captain and 149
percent more than a top-of-scale first officer.  The operations' downsizing
affects the aircraft Mesaba operates, which in turn affects the

---

[59] The largest employee group is the customer service agents, but they are not unionized.

[60] Mesaba, however, pays first officers the same wage rate regardless of aircraft.

demographics of the pilots' seniority and the seat any particular pilot occupies.

58.     To calculate the effect of the downsizing on the wages of the Saab pilots, it was necessary to estimate the seniority of the pilots flying the Saabs after the downsizing. Mesaba estimates it will need 410 pilots to operate a fleet of 49 aircraft. In October 2005, Mesaba employed 933 pilots. If all but the most senior 410 pilots were furloughed, the average seniority of the Saab pilots would increase by 5.0 years. (See Exhibit 11.) If the most senior of these pilots became captains, the realignment would increase the average hourly wages of Saab pilots by 16.3 percent.[61]

### EXHIBIT 11: AVERAGE MESABA CREW COST OF SAAB PILOTS

|  | Before Downsizing | After Downsizing |
| --- | --- | --- |
| **Number** | 538 | 410 |
| **Average Seniority*** | 5.9 | 10.9 |
| **Average Hourly Crew Cost**** | $86.63 | $100.77 |

Source: Mesaba Airlines.
Notes: Pay scales and Mesaba seniority as of October 2005. "After Downsizing" assumes:
(1) 49 Saabs and no CRJs, and (2) lowest seniority pilots are furloughed.
*Seniority starts at 1 year.
** Dollar per paid hour, sum of captain and first officer.

---

[61] This analysis assumes that half the pilots are captains. In fact, 56 percent of Mesaba's Saab pilots were captains in October 2005. Using that ratio, the hourly pilot wages of the Saabs would have increased 15.9 percent.

40

### *The Effect of the Contraction on Obtaining Additional Flying*

59.     Based on overall industry trends and Mesaba's experience at Northwest,
Mesaba has little future growth potential as a turboprop operator.  While
overall airline industry traffic has now returned to pre-9/11 levels, short-
haul passenger traffic still remains well below pre-September 11th levels,
as the additional time and increased inconvenience of more rigorous
security screening has changed travel patterns.  The number of Northwest
(and Northwest Airlink) origin and destination ("O&D") passengers
traveling less than 250 miles has declined by more than 30 percent since
pre-September 11th, while the number of passengers traveling between 250
and 400 miles have declined more than 18 percent.[62]  Turboprops, like
Mesaba's Saabs, are most efficient in short haul markets.  Thus, as shown
in Exhibit 12, these changes have substantially impacted Mesaba's
turboprop operations.

---

[62] This is based on the *Origin and Destination Survey* of the Department of Transportation, years
ending Q2, 2001 and Q2, 2005.  Origin and destination passengers are those passengers counted
on the basis of their starting and ending point of their journeys, regardless of whether or not they
make a connection.  For example, a passenger traveling between Cedar Rapids and Duluth with a
connection in Minneapolis is counted as a single O&D passenger.

**EXHIBIT 12: MESABA TURBOPROP DEPARTURES FROM MSP AND DTW, 2000 VS. 2005**



Sources: U.S. DOT T100, 2005 Q2 and 2000 Q2.

60.     Moreover, the increased cost of its continuing operations makes it more difficult for Mesaba to obtain additional flying.   When evaluating a business opportunity, a firm compares the revenues it expects to generate with the costs it expects to incur.   Similarly, in bidding for work, a firm would offer a price based on the competitive environment, but would not propose a price less than its expected cost of service.

61.     When an airline expands, it typically hires new workers.   Because these workers necessarily have low seniority, the labor costs of these incremental services are below the costs of its existing services.   Mesaba's downsizing significantly increases its cost of obtaining additional flying: Mesaba will be unable to use new hires but instead it would have to rely

42

on recalled furloughed workers when expanding output. Indeed, given the present seniority of its workforce, Mesaba can expect additional flying it obtains to employ recalled workers with considerable seniority.[63]

## VII.   IN ORDER TO SURVIVE, MESABA MUST REDUCE ITS LABOR COSTS

62.    While Mesaba's costs are increasing relative to other carriers, the rates network carriers are paying for regional carrier services appear to be declining, as a result of the changing competitive environment and the growth of efficient low cost regional carriers such as Mesa and Republic. The narrowing gap between average compensation of regional and network carriers is also putting further pressure on the rates for regional services. Mesaba is now caught in the cross hairs of falling prices and rising costs. Mesaba must reduce its costs to survive.

### *Securing the Saab Fleet*

63.    Though regional carriers provide service in a variety of different aircraft, a carrier cannot instantly and costlessly shift its resources from flying one type of aircraft to another. To fly a particular type of aircraft, a carrier must first be certified by the FAA and then provide the requisite training

---

[63] To the extent Mesaba faced additional costs because it could not reduce fixed inputs in proportion to the reduced flying it would not have to expand them proportionately.

to its flight and maintenance personnel.  Mesaba is not only certified to operate Saab aircraft, but it is the largest Saab operator in the United States, which should place it in a position to compete for Northwest's Saab operations.   However, Mesaba's experience with the Saabs, apparently does not translate into much of a competitive advantage.  In 2005, Mesaba bid on RFPs issued by Continental for turboprop flying at its Houston and Cleveland hubs.[64]   Though Mesaba's bid was at rates equivalent to those it charges Northwest, Continental selected Colgan Air to operate the Saabs at Houston, and Mesaba believes CommutAir has been selected to operate the Cleveland aircraft.   Continental informed Mesaba that other carriers had offered more attractive rates.[65]

64.   As previously noted, Mesaba believes it will need to cut the rate it presently charges Northwest for operating Northwest's Saab aircraft by five percent.[66]

---

[64] See *Declaration of John Spanjers*, In re:  Mesaba, Aviation Inc., Debtor, United States Bankruptcy Court, District of Minnesota, Case No. 05-39258 GJK, February 2, 2006.

[65] See *Declaration of Hien Cao*.

[66] See *Declaration of Hien Cao*.  Mesaba currently operates a fleet of Saabs at each of Northwest's three hubs.  However, Northwest, could elect to use a different regional carrier at one or more of its hubs.

### *Calculating the Necessary Reduction in Wage Rates*

65.    A reduction from a fleet of 100 aircraft to a fleet of 49 Saabs would increase Mesaba's unit costs.  This is partly the result of its reduced scale of operations.  But the increased longevity of its work force would also put considerable upward pressure on Mesaba's labor costs.  Consequently, the reduced rate Mesaba expects to be paid by Northwest to operate the Saabs will not be sufficient to cover its costs.

66.    Given an estimate of the rate Northwest will pay for its services, Mesaba can calculate the revenues a new Saab agreement will generate.  Knowing those revenues, Mesaba can also calculate the costs it must achieve to generate the necessary profit margin.  Profits are payments to a firm's investors, and they must be factored into any cost calculation.  Mercer has advised Mesaba that investors considering whether to invest in the risky airline business would expect a regional airline such as Mesaba to earn an eight percent profit margin, where profit margin is measured as earnings before interest and taxes as a percent of revenues.[67]

---

[67] See *Declaration of Peter Walsh,* Mesaba Aviation Inc., Debtor, United States Bankruptcy Court, District of Minnesota, Case No. 05-39258 GJK, February 2, 2006.

.

67.     Based on a five percent rate reduction and an eight percent profit margin, Mesaba calculates a need to reduce its annual costs by 25.6 percent in order to continue operating Northwest's Saab fleet after downsizing its operations to reflect its smaller scale of activity.[68]  Mesaba estimates it can achieve much of that cost savings by reducing non-labor costs, including reduced fixed costs and renegotiated lease agreements.  Mesaba, however, must also reduce employee compensation (wages, benefits, and productivity) by 19.4 percent and it proposes to cut compensation of each of the various labor groups by that percentage.[69]  The proposed reductions in compensation are necessitated, at least in part, to offset the higher pay rates caused by the increased seniority stemming from the smaller work force.

68.     Mesaba plans to achieve these labor costs saving through wage and benefit reductions as well as steps to increase productivity.  As part of its restructuring plan, Mesaba has reduced its annual non-contract and management ("NCM") employee costs, but it also requires a proportionate reduction by the unionized employees.  Mesaba's unionized employees have been asked to contribute wage reductions, productivity gains, and reduced benefits.

---

[68] Mesaba Aviation Inc, "Business Plan", December 2, 2005, p. 43.

[69] *Declaration of Hien Cao.*

46

69.     Mesaba proposes lowering the captain and first officer pay scales for the

Saab by 15.1 percent.  Recall that as the result of the increased seniority

the average hourly rate for Saab pilots would increase considerably.

Despite the decreased pay scale, Mesaba's hourly pilot wage costs

(including both captain and first officers) for the Saabs would only

decrease by 1.3 percent from their level prior to the contraction.  In other

words, and as shown in Exhibit 13, the proposed decrease in the pay scales

barely compensates for the estimated impact of the increased seniority on

pilot pay.

**EXHIBIT 13: MESABA SAAB PILOT AVERAGE HOURLY CREW COST AT CURRENT AND PROPOSED RATES**



Sources: Mesaba Airlines.
Notes: "Current Contract" as of October 2005. Seniority as of October 2005.

70.     The story is similar with respect to flight attendants.  The proposed flight

attendants pay scale would be reduced by 15.7 percent.  Because of their

increased seniority, however, the average hourly wages of flight attendants would only be 1.2 percent lower after the contraction.  (See Exhibit 14.)  In short, the proposed pay scale would essentially restore the flight attendant wage component of Mesaba's costs to the pre-contraction level.

**EXHIBIT 14: MESABA AVERAGE HOURLY FLIGHT ATTENDANT COST UNDER CURRENT AND PROPOSED PAY SCALES**



Sources: Mesaba Airlines
Notes: Current pay scales and seniority as of October 2005

71.   Mesaba, like any carrier, considers the effect of its pay scales on its costs, and the proposed reductions in pay scales largely adjust for the added seniority of Mesaba's work force.  Employees, on the other hand, consider the effect of the pay scale on their wages.  In this regard, it may be reasonable to compare Mesaba's proposed pay scales to other regional carrier pay scales.  With respect to the captain's rates, Mesaba's top-of-scale pay for 30-seat aircraft would be the lowest of the major regional carriers, although it would be only two percent below Mesa's top-of-scale rate.   On the other hand, its pay scale for first officers would be substantially higher than many other carriers.  Its top-of-scale pay would

48

be 12.5 percent higher than Pinnacle's first officers rate for 30 seat aircraft and 30 percent higher than Mesa's.[70]

72.     Mesaba's proposed top-of-scale wage rate for flight attendants is 0.9 percent above the wage rate for Tran States.  For flight attendants with between two and fourteen years of seniority (which account for over 98 percent of the Company's flight attendants), the average of Mesaba's proposed flight attendant pay scales is four percent below Pinnacle's rates.[71]

### Establishing Pay Scales to Enable Future Growth

73.     Because it has a more senior workforce, Mesaba's existing pay scales further disadvantage it relative to other regional carriers in competing for additional flying opportunities.  In order to establish a competitive cost structure, Mesaba must therefore establish a pay scale for its pilots somewhat below those of other regional carriers.  The proposed pay scales continue Mesaba's existing policy of common rating first officer pay across fleet types.  In addition, following the practice of a number of carriers, both regional and network, it has included jet aircraft of different

---

[70] Pinnacle does not presently operate a 30 turboprop.

[71] Mesaba's proposed starting pay for flight attendants is 15 percent below the starting pay at Pinnacle, and for flight attendants with seniority of six months to two years, Mesaba's proposed hourly pay is 9.2 percent below Pinnacle's average pay.  Mesaba's flight attendants reach top-of scale at 14 years.

sizes—those ranging from 44 to 86 seats—under one pay scale.[72]  These

pay scales produce the wage costs necessary for Mesaba to compete

effectively given its more senior work force.

### Competing for New Flying Without New Hires

74.    To remain a viable regional carrier, Mesaba must be able to secure

additional flying.  The contraction following the Northwest bankruptcy not

only affects the economics of Mesaba's operation but also impairs

Mesaba's competitiveness in bidding for new flying opportunities.

Carriers that have been growing can add new employees as they expand.

In contrast, if Mesaba expands, it must do so by first rehiring furloughed

workers who, in some cases, have considerable seniority and accordingly

are more highly paid.  Mesaba established its top-of-scale RJ captains rate

equal to Mesa's top of scale rate for its 50 seat RJs, and for other pilots

with lower longevity the Mesaba rate is with five percent of Mesa's rate.

Mesa not only has a low pay scale, but because of its rapid growth it has

low seniority as well.  Due to the higher senior of its workforce, Mesaba's

lower pay scale does not necessarily translate into a cost advantage due to

the higher seniority of its workforce.

---

[72] For turboprops, the range of aircraft is 20-74 seats.  This is the same seat range Mesa maintains
for its turboprop pilots.

75. To examine the effect of seniority on Mesaba's costs, I compared Mesaba's and Pinnacle's pilot cost of added RJ flying. Pinnacle, the other Airlink carrier, has pay scales comparable to Mesa's, and its workforce also has relatively low seniority. Moreover, because Pinnacle provides the vast bulk of the Airlink service, it is likely to be an important bidder in the RFP Northwest recently issued.[73]

76. Pinnacle has grown much more rapidly than Mesaba, and as a result its workforce is less senior. Even before Mesaba's downsizing, Mesaba's most junior captain had five years of seniority compared with the one year of seniority of Pinnacle's most junior captain.[74] As a result, when bidding for new flying, a rapidly growing carrier like Pinnacle will be able to base its proposal on the pay rate of a newly hired first officer, and a captain with little seniority. In contrast, at the downsized Mesaba, both the first officers and captains will have substantial—and costly—seniority.

77. This added seniority of the Mesaba pilots translates into a substantial increase in the cost of any additional flying. The average pilot cost per hour to Pinnacle of adding 25 aircraft to its existing fleet would be $84.90

---

[73] Pinnacle Airlines Corp, SEC Form 8-K, January 13, 2006.

[74] After the contraction, Mesaba's most junior captains would have nine years of experience. Mesaba provided to me a list of Pinnacle's pilots listed by seniority as of December 2005, along with a similar list of Mesaba's pilots.

51

per hour at its existing rates.[75]   Under Mesaba's proposed rates, the cost per pilot of adding 25 additional RJ aircraft would be $109.48 per hour in pilot wages.[76]   However, because the RJ has a higher pay scale than the Saab, the more senior Mesaba pilots, who had been flying the Saabs, would shift to the RJs, and, as a result the cost of operating the Saabs would fall, because they would have less senior crews.   This decline in the cost of operating the Saabs would be directly attributable to the addition of the RJ flying and should be credited to the cost of operating the CRJs. Doing so lowers the pilot cost per block hour to $100.60, which is still 18.5 percent above Pinnacle's cost of flying the added RJs.   (See Exhibit 15.)

---

[75] The cost of Pinnacle's added flying was calculated by first assuming each additional aircraft required 8.2 pilots.  (This is the average number of pilots per aircraft that Mesaba used to operate its Avros.)  It was further assumed that the added pilots were new hires with no seniority and that additional pilots were added using equal numbers of captains and first officers.

[76] Because Pinnacle has an even number of captains and first officers, it was assumed that Mesaba did as well.

**EXHIBIT 15: COMPARING PILOT COST PER HOUR OF ADDING 25 RJS**



Sources: Mesaba Airlines.
Notes: Pay scales for Mesaba are proposed.  Mesaba seniority is as of October 2005. Pinnacle pay scale and seniority as of
December 2005.  Assumes current fleets of 49 Saabs for Mesaba and 124 RJs for Pinnacle.

78.    Mesaba's pilot costs remain above Pinnacle's even under more
conservative assumptions.  Pinnacle provides regional service exclusively
for Northwest, and, if it were to continue to do so, and Northwest would
continue with its same RJ fleet, any gains in RJ flying for Northwest by
Mesaba (or any other regional) would result in reduced flying for
Pinnacle. In that case, Pinnacle's flying for Northwest might not be in
addition to the service it presently provides.  Continuing to operate its
present fleet of 124 aircraft would result in an average pilot cost of $87.38,
and thus the rate paid by Northwest would have to cover those costs.
Reducing its fleet by 25 or 50 aircraft would increase the seniority of its
pilots, and as a result, the average hourly wage paid by Pinnacle.  For
example, losing 50 of its existing fleet of RJs would increase its average
hourly pilot wages of operating the remaining aircraft to $94.98.  This is

53

substantially higher than Pinnacle's cost of adding new flying because, as with the case of Mesaba, the contraction increases the seniority of its workforce.

79.    If Mesaba were to get the additional 50 aircraft, it would be able to return to nearly the same longevity composition at which it had operated prior to the contraction.   Accordingly, the average seniority—and hence the average wages—of the added pilots would be lower than if it added only 25 aircraft.   Even under these conservative assumptions which increase Pinnacle's costs, the average wage costs of Mesaba's pilots for the added flying under its proposed rates would be higher than Pinnacle's average pilot cost for the pilots necessary to operate 74 RJs that would remain in its fleet.   Mesaba's costs under its proposed wage scale would be three percent higher than Pinnacle's even after crediting to Mesaba's RJ operations the savings from the lower seniority of its Saab pilots.

80.    This suggests that Mesaba's proposed pay scale is reasonable.   Given the higher seniority of Mesaba's work force, the proposed pay scale makes Mesaba competitive with Pinnacle in bidding for Northwest's RJ operations.   Moreover, Pinnacle may not be the lowest cost operator, and regional carriers other than Mesaba and Pinnacle will undoubtedly make proposals to Northwest.   In addition, it is possible that pilots at other

54

regional carriers may agree to reduce existing pay scales in order to gain added flying opportunities.[77]

### Common Rating Pilot Wage Scales

81.   Collective bargaining agreements between pilots and airlines have traditionally had two provisions that have had important implications for carrier operations.  First, a pilot flying a larger aircraft typically receives a higher wage rate.  Second, a pilot's ability to choose the aircraft and the seat depends on seniority.  Because pilots are paid more for flying larger aircraft, the more senior pilots naturally gravitate to the larger aircraft. For carriers with multiple aircraft types, these pay differentials by aircraft, by seat, and by seniority encourage pilots to shift among aircraft as opportunities present themselves.

82.   If the aircraft in a carrier's fleet require different skill sets, the existing wage structure imposes training costs on carriers.  There are important and fundamental differences in carriers maintaining fleets of different aircraft (e.g. Mesaba's Saabs and Avros), and a pilot shifting from one aircraft to the other needs specialized training, which imposes costs on the carrier.

---

[77] See, for example, letter from Pinnacle's CEO to its employees on December 9, 2005 noting the "difficult challenges" the carrier faces in the aftermath of Northwest's bankruptcy.

83.     Under its existing agreement with its pilots, Mesaba has separate pay scales for each of the three aircraft types it operates.  Like most carriers, a captain with a given seniority earns more for flying a larger aircraft.  For example, a Mesaba captain with 20 years of seniority flying a 69-seat Avro earns 47.5 percent more than a pilot with the same seniority flying a 30-seat Saab.  In the case of Mesaba, however, the relationship between aircraft size and pay scale does not extend to first officers. The existing CBA sets the same pay scale for all its first officers regardless of equipment type.  This reduces training costs by reducing the incentive for first officers to change aircraft type in pursuit of higher wage rates.

84.     Mesaba is not the only carrier that common rates the pay of pilots across different size aircraft.  For example, Mesa, Republic and Skywest each use the same pay scale for their first officers flying 50 and 70 seat regional jets.  SkyWest also common rates its captains for 50 and 70 seat aircraft. Moreover, a number of carriers operating mainline equipment also use a common pay scale for aircraft of different sizes.  For example, United Airlines uses the same pay scale for pilots operating the narrow-bodied Boeing 757 as it does for the pilots operating the wide-bodied Boeing 767.[78]  Alaska uses the same pay scale for the Boeing 737-200 with 111

---

[78] Information on mainline pilot pay scales came from Airline Pilot Central.   See www.airlinepilotcentral.com

seats as it does for the B-737-900 with 172 seats.[79]   Continental's
agreement does not distinguish among particular aircraft type, but groups
its fleet into three general aircraft types:   small narrow-bodied, large
narrow-bodied, and wide-bodied.

85.    The higher pay received by major carrier pilots for operating larger and
larger aircraft may reflect the greater sophistication required by a pilot to
operate a larger aircraft.   In other cases, however, it merely reflects the
ability of the pilots to take some share of any productivity gain a carrier
may obtain from operating a larger aircraft.   It has also been shaped by
over 70 years of collective bargaining since Decision 83, which first
linked pilot compensation to the characteristics of the aircraft the pilots
flew.[80]   To the extent that the pilots were justified in receiving some of the
productivity gain from more efficient aircraft in the form of higher wages,
that justification is not directly applicable to regional carriers operating
under fee for departure contracts.

86.    Under regulation, with fares fixed, any such cost savings presumably
redounded to the carrier using the more efficient aircraft.   Such a rationale
certainly does not apply in the present regional carrier marketplace.   The

---

[79] Alaska Air Group, *Form 10-K Files with the SEC, For Year Ending December 31, 2004,* p. 13.

[80] John M. Baitsell, *Airline Industrial Relations:  Pilots and Flight Engineers* (Boston:  Harvard
University, 1966) pp. 31-32, 78-85.

regional carrier does not receive any productivity gain because it is compensated on the cost of providing the service, and thus any efficiency gains are passed on to the network carrier. In the case of regional carriers, therefore, commonality of pay rate among different sized aircraft is logical. Under its proposed contract, Mesaba intends to continue to common rate the first officer pay scales across different sized and types of aircraft (i.e., 20 to 86 seat aircraft). It also intends to common-rate jet captains (i.e., 44 to 86 seat) and turboprop captains (i.e., 20 to 74 seat) similar to what Alaska and United have recently done.

87.    Northwest operates 126 CRJs in its Airlink network, with Mesaba operating two of those aircraft and Pinnacle operating the rest.[81] Northwest's RFP seeks proposals to operate 126 RJs from 50 to 76 seats, which includes the 50-seat CRJ, which both Pinnacle and Mesaba fly for Northwest. Also in Bombardier's product line are larger regional jets, the CRJ-700 and the CRJ-900, which were introduced into service several years ago. The CRJ-700 can hold up to 75 seats in a single class configuration, and the CRJ-900 can hold up to 86 seats in a single class configuration (76 seats in a two-class configuration). Bombardier has designed the three aircraft models with a high degree of commonality. Accordingly, minimal additional training costs are required for pilots

---

[81] Under the scope clause in its existing pilot agreement, Northwest can operate up to 114 50-seat RJs. There is no limit on the number of RJs with less than 45 seats it can operate.

transferring among the three aircraft. Mesaba, therefore, proposes common rating the three aircraft including the larger CRJ-700 or CRJ-900 (two-class), which is at the upper range of the size of equipment Northwest is considering for its regional operations.

88.    Because of this high degree of commonality and because of the tendency for a number of mainline carriers to use the same pay scale for such similar aircraft, Mesaba's new pay scale would certainly be consistent with the policies of many in the industry.

89.    Pilots not only shift aircraft seats to increase their near term rate of pay, but some pilots shift aircraft even when such switches do not increase their pay. For example, Mesaba could possibly operate a CRJ-200 for one network carrier and an Embraer-145 for another, and pay pilots of each aircraft under the same pay scale. Under the present CBA, a more senior pilot could switch from one aircraft to the other even though such a switch would not increase the pilot's compensation. Such switching, however, may increase pilots' abilities to obtain positions with other carriers, while increasing Mesaba's cost.

90.    As noted, training a pilot is a significant expense, and limiting training is one reason some carriers seek to limit the aircraft types they operate. As a

regional carrier, Mesaba must be prepared to operate the aircraft the network carrier chooses, and expand the number of aircraft types as requested. Such a fleet expansion, however, opens up additional opportunities for pilots to obtain training opportunities unrelated to the carrier's operation. The added training costs generated by these opportunities, therefore, represent a tax a carrier must pay for expanding the types of aircraft it operates. Given the contraction it is currently undergoing, such a tax seems particularly unjustified in the case of Mesaba.

91.    To reduce this tax on expansion, Mesaba proposes to limit the ability of pilots to shift aircraft types independent of increased pay. While pilots may value such training because it increases their marketability, the training imposes costs on carriers like Mesaba. Common pay rates for captains and first officers clearly reduces the training costs to a carrier. Preventing pilots from bidding to operate aircraft where they do not receive a higher rate of pay further reduces unproductive training costs.

## VIII. OTHER PROVISIONS OF PILOT CBA HAMPER MESABA'S EFFICIENT OPERATION

92.    The existing CBA between Mesaba and its pilots contains a number of provisions that would inhibit it from operating efficiently after it emerged

from bankruptcy.   A number of these provisions impose substantial impediments to Mesaba and its parent from entering into efficiency enhancing transactions.   The current CBA imposes costs on Mesaba's merging or disposing assets, and a side letter to the CBA also introduces a number of distortions.   The impact of these provisions is likely to increase as the result of Mesaba's bankruptcy.   The changing competitive environment coupled with a number of exogenous events is dramatically reshaping the industry.   In this environment, imposing costs on the movement of capital and assets, as these provisions do, could hamper the future success of Mesaba.

### *Provisions Increasing the Cost of Merging*

93.   The present CBA has two provisions that limit the ability of Mesaba to merge with another carrier.   First, the CBA has a fence provision requiring the pilots of Mesaba to be fenced off from the pilots of the other carrier for up to 12 months, during which time no Mesaba pilots can be furloughed.   As recent developments in the industry have demonstrated, operating a carrier is a risky business.   Limiting the ability of a merged carrier to integrate its workforces can limit the synergies and efficiencies generated by the merger.   By preventing such an integration, this provision may deter an otherwise beneficial merger from occurring.

61

### *Limitations on MAIR that Effect Mesaba*

94.     An appendix to the CBA contains a side letter from Mesaba's parent that
also imposes significant costs to efficient transactions.  That letter requires
MAIR, if it establishes or purchases another carrier, to staff that carrier in
seniority order and the terms of their employment in the new entity be
governed by the Mesaba CBA.  Therefore, Mesaba, through no action of
its own, could face disruptions to its operations.  At the same time, the
agreement imposes requirements on MAIR that could deter it from making
efficient investments.

95.     Before Mesaba filed for bankruptcy, MAIR was the sole owner of Mesaba
and would necessarily fully incorporate the impact of any such investment
decision on Mesaba before making any investment.  Now that Mesaba is
in bankruptcy, this provision could deter others from investing in the
reorganized company.  If MAIR were not the only stockholder in the
reorganized Mesaba, other investors in Mesaba would be affected by the
actions of MAIR.  This would dramatically diminish the attractiveness of
a party other than MAIR investing in the reorganized company.

### *Limitations on Sale of Assets*

96.     Mesaba does not presently own any aircraft.   With the change in relationship between the regionals and the network carriers, it may decide that it is desirable to invest in its own fleet of aircraft through outright purchase or long-term lease.  In that event, a provision of the CBA would restrict the ability of Mesaba to sell or transfer 40 percent or more of its fleet to another company.  In the event of such a transfer, the carrier receiving the aircraft would be required to offer employment to the pilots under the current terms of the CBA.  Such a requirement restricts the marketability, and thereby the ownership costs, of the fleet.   Some potential purchasers may be uninterested in acquiring aircraft if they have to accept the terms of Mesaba's CBA and other potential purchasers may be precluded from such a purchase by agreements with their pilots.

## IX.   CONCLUSION

97.     Mesaba is facing an economic and financial crisis. Northwest, Mesaba's only customer, has not only dramatically reduced the number of aircraft allocated to Mesaba but is also seeking a significant rate reduction on its remaining flying. And while Mesaba is now free to bid for new flying opportunities with other legacy carriers, it faces stiff competition from a number of lower-cost regional carriers that have been rapidly growing, and therefore have far less senior (and less costly) workforces.

98.     In short, unless Mesaba can quickly and substantially lower its unit operating costs—including its labor costs—the Company's financial position will continue to deteriorate to the point where it will threaten the Company's very survival.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the

foregoing is true and correct.

Daniel P. Kaplan

Executed on February 2, 2006

# APPENDIX A:  CURRICULUM VITAE OF DANIEL P. KAPLAN

**Daniel P. Kaplan**
**LECG, LLC**
**1725 Eye Street, N.W., Suite 800**
**Washington, DC 20006**

## WORK EXPERIENCE

| | |
|---|---|
| Dates: | May 2004 - present |
| Company: | LECG |
| Position: | Director |

Provide economic analyses of market performance as well as damage calculations in antitrust and regulatory matters as well as with respect to contract disputes. Areas of expertise include mergers, price-fixing, predation and vertical restraints, with experience in airlines, entertainment, software, solid waste, and numerous manufactured products.

| | |
|---|---|
| Dates: | September 1989 – May 2004 |
| Company: | Glassman-Oliver Economic Consultants, Inc. |
| Position: | Senior Vice President, January 1994 - May 2004 |
| | Vice President, September 1989 - December 1993 |

Provided expert testimony, reports, and presentations assessing the competitive and financial impacts of various acts and practices.  Also provided damage estimates in antitrust and contract disputes.  Retained by private clients as well as by the U.S. Department of Transportation, the U.S. Department of Justice, the Federal Trade Commission and the Australian Competition and Consumer Commission. Provided expert testimony in federal and state court, in DOT regulatory proceedings and before the European Commission.

Dates:                 March 1985 to August 1989
Company:       Congressional Budget Office
                     Natural Resources and Commerce Division
Position:         Principal Analyst

At the request of Congressional committees, analyzed the impact of trade restraints, federal support of research and development, and government regulatory policies on domestic industries.  Prepared reports, memoranda and testimony that presented these analyses.

Dates:                 July 1979 – December 1984
Company:       Civil Aeronautics Board
                     Office of Economic Analysis
Position:        Director, August 1980 - December 1984
                     Chief, Policy Analysis Division, November 1979 - August 1980
                     Economist, Policy Analysis Division, July 1979 - November 1979

Directed and prepared comprehensive analysis of the economic performance of the deregulated airline industry, including the Congressionally mandated study on the impact of deregulation.  Made recommendations to the Board on a variety of regulatory issues, including mergers and airline subsidies. Managed team of economists, accountants and financial analysts.

Dates:                 December 1982 - March 1985
Company:       Civil Aeronautics Board/Department of Transportation
                     Bureau of International Aviation
Position:        Associate Director of Economic Affairs

Supervised staff of economists and analysts that administered regulations governing the prices of international air services. Developed strategies for bilateral and multilateral international aviation negotiations and represented the Board on U.S. delegations to these negotiations.

Dates:          September 1978 to June 1979
Company:        American University
                Department of Economics
Position:       Assistant Professor
                Taught graduate and undergraduate courses in price theory
                and industrial organization.


Dates:          October 1974 – August 1978
Company:        Federal Trade Commission
                Bureau of Economics
Position:       Deputy Assistant Director for Economic Evidence, January
                1977 - August 1978
                Economist, Division of Economic Evidence, October 1974
                - January 1977

                Supervised economic investigations of competition in the
                automobile industry and in the delivery of health care
                services.   Participated in investigations of grain
                merchandising and consumer food product markets.

**EDUCATION**

| | |
|---|---|
| Date: | 1974 |
| Organization: | University of Michigan, USA |
| Qualification: | Ph.D., Economics |

| | |
|---|---|
| Date: | 1972 |
| Organization: | University of Michigan, USA |
| Qualification: | M.A., Economics |

| | |
|---|---|
| Date: | 1970 |
| Organization: | University of Pennsylvania, USA |
| Qualification: | B.S. cum laude with distinction in Economics. |

**FELLOWSHIP AND HONORS**

Rackham Prize Fellowship, 1973-1974
Public Health School Fellowship, 1972-1973
Teaching Fellowship, 1971-1972
Beta Gamma Sigma, 1970

**TESTIMONY**

Jan Tokarz d/b/a J.J. Store v. LOT Polish Airlines, et al. U.S. District Court for the Eastern District of New York, January 26, 2006; witness for LOT; submitted report, September 30, 2003; deposition testimony, December 6, 2003.

Submitted Report on behalf of United Airlines in response to FAA proposed rule on "Congestion, Delay Reduction and Operating Limitations at Chicago O'Hare International Airport"; Proposed Rule. 70 Fed. Reg. 15520 (March 25, 2005). Docket FAA-2005-20704,

In the matter of Brendan Airways et.al. v. The Port Authority of New York and New Jersey and Newark International Airport before the Department of Transportation, Docket OST-05-20407-1, April 4, 2005. testified on behalf of 13 carriers serving Newark Liberty Airport; submitted rebuttal report, March 3, 2005.

Submitted direct and rebuttal testimony on behalf of FedEx Express, 2005/2006 U.S. – China Air Services, Case and Designations, Docket OST-2004-19077, October 20, 2004 and November 10, 2004.

Submitted direct testimony on behalf of FedEx Express, In the Matter of 2004 Cargo Designation and 2004/2005 All-Cargo Frequencies (U.S.-People's Republic of China); OST-2004-18468, August 2, 2004.

Submitted written testimony on behalf of Defendant in UMB Bank, N.A., as trustee, v. ChaseMellon Shareholder Services, L.L.C., U.S. District Court for Central District of California, Western Division, January 17, 2003. (Deposition testimony: January 28, 2003.)

Submitted written testimony on behalf of Plaintiff in Spirit Airlines, Inc. v. Northwest Airlines, Inc., U.S. District Court for Eastern Michigan, April 5, 2002. (Deposition testimony: June 14, 2002.)

Submitted report on behalf of the Allied Pilots Association in "David W. Allen, et. al., v. American Airlines, Inc. and Allied Pilots Association," United States District Court, District of Nevada, July 17, 2000.

Submitted rebuttal testimony on behalf of United Airlines in "1999 U.S.-Argentina Combination Service Case," Docket OST-99-6210, February 10, 2000.

Submitted report on price-fixing claim on behalf of defendants in "National Guardian Life Insurance Company v. Crestar Securities Corp.," United States District Court, Western District of Wisconsin, December 17, 1998.

Prepared report, "An Evaluation of Repsol's Damage Claim," submitted to the International Chamber of Commerce, Court of Arbitration, Paris, France, In the Matter of Arco Chemical Company and Repsol Quimica. August 15, 1997. (Written with Lloyd Oliver on behalf of Arco Chemical.)

Trans World Airlines vs. Omega World Travel, Missouri Circuit Court (St. Louis) May 6, 1997. Witness for Trans World Airlines.

Submitted written testimony estimating damages on behalf of plaintiffs in Keystone Corporation and American Network Exchange v. Boston Telecommunications Co. et. al., United States District Court, Eastern District of Virginia, April 22, 1997.

Before the European Commission on the proposed American Airlines-British Airways Alliance, February 3, 1997. Witness for British Airways.

v

"Miami International Airport Rates Proceeding," Department of Transportation administrative proceeding, January 10, 1997.  Witness for Air Canada, Delta Air Lines, Trans World Airlines, United Air Lines and USAir.

Submitted written testimony on behalf of defendant Trans World Airlines in Omega World Travel, Inc. v. Trans World Airlines Inc. and Airlines Reporting Corporation, United States District Court, Eastern District of Virginia, July 3, 1996.  (Deposition testimony:  July 30, 1996.)

Submitted written testimony on behalf of the defendant Trans World Airlines in ValuJet Airlines Inc. v. Trans World Airlines, Inc, et. al., United States District Court, Northern District of Georgia,  June 27, 1996.

Before "The National Commission to Ensure a Strong Competitive Airline Industry" on the effect of bankrupt carriers on the financial condition of airlines, June 1993.

American Airlines vs. United Airlines, Federal Southern District Court of New York, March 1992. Witness for United Airlines.

"United States - United Kingdom Regional Airport Case," Department of Transportation administrative proceeding, October 18, 1990. Witness for Trans World Airlines.

Hearing on "The Adequacy of Competition in the Airline Industry," September 21, 1989, before the Subcommittee on Aviation of the Committee on    Public Works and Transportation, U.S. House of Representatives.

FTC vs. Borden Inc. (Real Lemon), FTC administrative proceeding, January 1976. Plaintiff rebuttal witness.

## PUBLICATIONS AND PAPERS

"A Fresh Approach to CRS Regulation," *Aviation Daily*, May 16, 2003.

"Using a Cost Standard to Evaluate Predation in the Airline Industry," *The Transportation Antitrust Update*, Winter 2000.

"The Pursuit of Competition: A Review of U.S. Public Policy in the Airline Industry," in Jenkins, *Handbook of Airline Economics*, McGraw-Hill, 1995.

"The Changing Airline Industry," in Weiss and Klass, *Regulatory Reform: What Actually Happened*, Little Brown, 1986.

Deregulating the Airlines, M.I.T. Press, 1985 (with E. Bailey and D. Graham).

"Efficiency and Competition in the Airline Industry," *Bell Journal of Economics*, Spring 1983 (with D. Graham and D. Sibley).

"Airline Deregulation is Working," *Regulation*, May/June 1982 (with D. Graham).

**Government Reports:**

"The Savings and Loan Problem:  A Discussion of the Issues," Staff Memorandum, Congressional Budget Office, February 1989 (with others).

Policies for the Deregulated Airline Industry, Special Study, Congressional Budget Office, July 1988 (with Mark Dayton).

Using Federal R&D to Promote Commercial Innovation, Special Study, Congressional Budget Office, April 1988.

The GATT Negotiations and U.S. Trade Policy, Report, Congressional Budget Office, June 1987 (with others).

How Federal Policies Affect the Steel Industry, Special Study, Congressional Budget Office, February 1987 (with others).

Has Trade Protection Revitalized Domestic Industries?, Report, Congressional Budget Office, November 1986.

"Protecting the Textile and Apparel Industries," Staff Working Paper, Congressional Budget Office, September 1985 (with P. Siegleman).

"Competition and the Airlines: An Evaluation of Deregulation," Office of Economic Analysis Staff Report, Civil Aeronautics Board, December 1982 (with D. Graham).

"Proposal to Adopt Noise and Congestion Fees at Washington National Airport," January 1981.  Submitted to the Federal Aviation Administration by the staff of the Civil Aeronautics Board as its comments on a proposed rule making (with D. Graham and K. Sharp).